**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| ERIC BEAUMONT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-03546-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| WALTER SCOTTY BRANCH; SHEA C. | ) | |
| HARRELSON; AVANTE DIAGNOSTICS | ) | |
| LLC, *a Delaware entity*; MEDCOAST LLC, | ) | |
| *a South Carolina entity*; and VIKOR | ) | |
| SCIENTIFIC LLC, *a South Carolina entity*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The following matter is before the court on defendants Walter Scotty Branch ("Branch"), Shea C. Harrelson ("Harrelson"), Avante Diagnostics LLC ("Avante"), MedCoast LLC ("MedCoast"), and Vikor Scientific LLC's ("Vikor") (collectively, "defendants") motion to dismiss for failure to state a claim. ECF No. 14. For the reasons set forth below, the court grants in part and denies in part the motion.

## I.  BACKGROUND

This dispute arises from two interrelated agreements to invest funds into start-up laboratory ventures to allow those ventures to expand and roll out "revolutionary laboratory diagnostic testing." ECF No. 1, Compl. ¶¶ 10–11. Branch and Harrelson approached plaintiff Eric Beaumont ("Beaumont") to solicit funding for their laboratory ventures and promised him "that his investment would make him a partner and co-owner in their laboratory ventures, and, if they succeeded, he would receive lifelong returns that would provide for his family for the rest of their lives." Id. ¶ 12. Beaumont entered into the first investment agreement with Branch and Harrelson on August 23, 2017, (the

1

"August 2017 Agreement") wherein Beaumont agreed to provide $100,000 in exchange for 1.5% of Branch and Harrelson's laboratory ventures' gross profits.  Id. ¶ 15; see also ECF No. 1-1.[1]  At the time of the August 2017 Agreement, Branch and Harrelson had formed the company MedCoast which had an existing contract with North Central Florida Neurodiagnostic Services ("NCF").  Compl. ¶ 16.  After the initial investment, Branch and Harrelson grew their laboratory ventures, and on September 13, 2017, they formed Avante.  Id. ¶ 23.  Within days of the first investment, Branch solicited Beaumont for an additional $150,000 in exchange for fifteen percent of Branch's own partnership interest in the laboratory ventures, which they formalized through payment and a written agreement fully executed on September 21, 2017 (the "September 2017 Agreement").  Id. ¶¶ 20–27; see also ECF No. 1-2.  Together, Beaumont received two types of ownership or profit interests in exchange for his high-risk investments: (1) 1.5% of gross profits from Branch and Harrelson's laboratory ventures; and (2) fifteen percent of Branch's partnership interest in those ventures.  Compl. ¶ 28.

Starting in the fall of 2017, Beaumont began receiving separate payments pursuant to the two agreements.  Id. ¶ 29.  He initially received payments directly from NCF under the August 2017 Agreement and received payments from Branch personally under the September 2017 Agreement.  Id.  However, payments from NCF ceased after about six months when Branch and Harrelson stopped conducting business with NCF.

---

[1] In Beaumont's response in opposition, he clarifies that the first attachment entitled, "Sales Representative Employment Agreement," only serves to evidence the existence of the August 2017 Agreement but is not itself the written agreement.  ECF No. 15 at 3.  Branch and Harrelson purportedly told Beaumont that "there was no prepared investor agreement and no time to draft one, so Mr. Beaumont accepted the inaptly titled NCF document as proof of the parties' agreement."  Id.

Id. ¶ 34.  Thereafter, starting in March 2018, payments under the August 2017 Agreement came directly from Harrelson.  Id.  For approximately the first six-to-nine months, Beaumont was able to verify, in an online portal, that the payments he received under the August 2017 Agreement accurately reflected the true percentage of the ventures' gross profits.  Id. ¶ 30.

Consistent with the laboratories' growth, Beaumont's payments under the August 2017 Agreement dramatically increased from an initial payment of $2,162.83 on October 18, 2017, to monthly payments of more than $20,000 in September and October 2018. Id. ¶ 31.  However, around that same time, Branch and Harrelson terminated Beaumont's access to the online portal, id. ¶ 32, and on May 16, 2018, Branch and Harrelson formed Vikor, id. ¶ 35.  After a payment on October 26, 2018, payments ceased for approximately six months during a restructuring and transition period.  Id. ¶ 39.  As of the restructuring, Beaumont had received $225,147.71 from his investments.  Id.

On April 13, 2019, Beaumont provided his bank account information to Harrelson to facilitate anticipated payments coming from Vikor starting on April 15, 2019.  Id. ¶ 41. On April 17, 2019, Beaumont began receiving payments solely from Vikor, as opposed to from Harrelson or Branch.  Id. ¶ 42.  On May 23, 2019, Branch emailed Beaumont to express that the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220, meant that they could no longer pay per sample or tied to revenues, which restricted Branch and Harrelson's ability to comply with the August 2017 Agreement and the September 2017 Agreement.  Id. ¶ 44.  As such, Branch and Harrelson limited Beaumont's payment to a lump sum of $7,500 per month every month moving forward, rather than as a percentage of gross profits or ownership as was stipulated by the

agreements.  Id.  Beaumont received these $7,500 per month for nearly three years.  Id. ¶ 49.  Beaumont avers that Branch and Harrelson misrepresented the impact of EKRA on the agreements, and in so doing, Harrelson, Branch, and Vikor willfully, wantonly, or at the very least, recklessly "purposefully [and] severely reduc[ed] Mr. Beaumont's payments."  Id. ¶ 45.

On June 1, 2020, Branch and Harrelson administratively dissolved Avante.  Id. ¶ 50.  With each transition—from MedCoast to Avante and from Avante to Vikor— neither Branch nor Harrelson gave any indication that the changes, or even the dissolution of Avante, somehow changed Beaumont's interests.  Id.  However, on February 15, 2023, Vikor's Chief Financial Officer Kelly Diamiano ("Diamiano") emailed Beaumont to explained that the company was restructuring its ownership and that the email served as a ninety-day notice that his monthly payments of $7,500 would cease.  Id. ¶ 51.  As of the filing of the complaint, Beaumont had received a total of $609,666.71.  Id. ¶ 52.  On April 26, 2023, Beaumont served Vikor, Branch, and Harrelson with a Notice of Breach and Demand for Good-Faith Negotiations, which disputed both the allegedly EKRA-based 2019 unilateral payment modification and defendants' new unilateral modification terminating Beaumont's interests and ceasing payments altogether.  Id. ¶ 54.  Defendants responded through counsel, and the parties unsuccessfully attempted mediation.  Id. ¶ 55.

On July 21, 2023, Beaumont filed this lawsuit against defendants pursuant to diversity jurisdiction, 28 U.S.C. § 1332.[2]  ECF No. 1, Compl.  On September 1, 2023,

---

[2] Beaumont is a resident of Utah, Branch is a resident of Arizona, Harrelson is a resident of South Carolina, and none of the corporate defendants are residents of Utah because the sole recognized members of Avante, Medcoast, and Vikor (together, the

defendants filed a motion to dismiss for failure to state a claim.  ECF No. 14.  Beaumont responded in opposition on September 15, 2023, ECF No. 15, to which defendants replied on September 22, 2023, ECF No. 17.  The court held a hearing on this motion on October 17, 2023.  ECF No. 19.  As such, this motion has been fully briefed and is now ripe for review.

## II.  STANDARD

### A.  Fed. R. Civ. P. 12(b)(6)

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint."  Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").  To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief.  Mylan Lab'ys, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff.  Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999); Mylan Lab'ys, 7 F.3d at 1134.  "To survive a motion to dismiss, a complaint must contain sufficient factual

_____

"corporate defendants") are Branch and Harrelson.  Thus, there is complete diversity between the parties and the amount in controversy exceeds $75,000.  Compl. ¶¶ 1–2.

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III.  DISCUSSION

Beaumont brings eleven causes of action. Compl. ¶¶ 61–149. Three of the claims are based on the August 2017 Agreement: (1) breach of contract, id. ¶¶ 61–73; (3) breach of the implied covenant, id. ¶¶ 86–91; and (6) breach of contract accompanied by fraudulent act, id. ¶¶ 106–10.[3] Three of the claims are based on the September 2017 Agreement: (2) breach of contract, id. ¶¶ 74–85; (4) breach of the implied covenant, id. ¶¶ 92–97; and (7) breach of contract accompanied by fraudulent act, id. ¶¶ 111–119. The final five claims are based on both agreements and the general facts underlying Beaumont's claims: (5) fraud, id. ¶¶ 98–105; (8) failure to provide access to books and records in violation of S.C. Code Ann. § 33-44-408(a), id. ¶¶ 120–24; (9) member oppression under South Carolina law, id. ¶¶ 125–35; (10) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), id. ¶¶ 136–40; and (11) successor liability, id. ¶¶ 141–49. Defendants seek to dismiss all eleven claims because the claims fail to state a plausible cause of action, are barred by the applicable statute of limitations, are barred by the applicable statute of frauds, and/or fail to state fraudulent acts with particularity for those claims alleging fraud. ECF No. 14 at 1–3.

---

[3] The court includes the number (e.g., "(#)") which correlates to the cause of action included in the complaint. For example, the second cause of action is delineated as "(2) breach of contract," even though it is the fourth claim that this court describes.

The court starts by evaluating defendants' affirmative defenses before determining whether Beaumont has plausibly stated a claim for relief under the applicable pleading standard.

## A. Affirmative Defenses

"[A] motion to dismiss filed under [Fed. R. Civ. P. 12(b)(6)], which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc). There is an exception to this general rule where facts sufficient to rule on an affirmative defense are alleged in the complaint, which allows the court to reach the affirmative defense in its order resolving the Rule 12(b)(6) motion to dismiss. Id. But this principle only applies if all facts necessary to the affirmative defense clearly appear on the face of the complaint. Id.

Defendants raise the affirmative defense of the South Carolina statute of limitations as applied to Beaumont's contractual claims, SCUTPA claim, and fraud claims. See ECF No. 14-1 at 9 (breach of contract), 14 (fraud), 19–20 (SCUTPA). In response to Beaumont's breach of contract claims, defendants also raise the affirmative defense of the statutes of frauds of both South Carolina and Florida. Id. at 11–12. In his response in opposition, Beaumont explains that a Rule 12(b)(6) motion to dismiss "generally cannot reach the merits of an affirmative defense such as the statute of frauds or a statute of limitations." ECF No. 15 at 11. However, the court may rule on affirmative defenses "in relatively rare circumstances where all facts sufficient to rule on an affirmative defense are alleged in the complaint." Id. (internal quotation marks and citations omitted). Beaumont claims that he has presented a plausible argument

supported by factual allegations which together lead to the conclusion that the asserted
defenses do not apply, meaning dismissal would be premature and further factual
development should be permitted. Id. at 11–12. The court begins by evaluating the
statute of limitations and thereafter the statute of frauds, ultimately finding that neither
warrant the dismissal of the action at this early stage of litigation.

### 1. Statute of Limitations

"The dismissal of a complaint on statute of limitations grounds is itself a rare
occurrence because a statute of limitations defense must clearly appear on the face of the
complaint." Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, 94 F. Supp. 3d 719, 724
(D.S.C. 2015) (internal citation marks and quotations omitted and alterations adopted).
Under South Carolina's "discovery" rule, "the statute of limitations begins to run from
the date the injured party either knows or should know, by the exercise of reasonable
diligence, that a cause of action exists for the wrongful conduct." Epstein v. Brown, 610
S.E.2d 816, 818 (S.C. 2005), overruled on other grounds by Stokes-Craven Holding
Corp. v. Robinson, 787 S.E.2d 485 (S.C. 2016). In other words, the statute of limitations
begins to run "when the facts and circumstances of the injury would put a person of
common knowledge on notice that some right has been invaded or the claim against
another party exists." Harrell v. BMW of N. Am., LLC, 517 F. Supp. 3d 527, 533
(D.S.C. 2021) (citing Benton v. Roger C. Peace Hosp., 443 S.E.2d 537, 539 (S.C. 1994)).
South Carolina law provides for a three-year statute of limitation for contractual claims,
fraud claims, and those brought pursuant to SCUTPA. S.C. Code Ann. §§ 15-3-530
(contract and fraud), 39-5-150 (SCUTPA).

Defendants allege that the South Carolina three-year statute of limitations time-bars Beaumont's contractual claims, SCUTPA claim, and fraud claims because the first breach happened more than four years ago on May 23, 2019, when defendants capped Beaumont's monthly payments at $7,500.  See ECF No. 14-1 at 9.  In response, Beaumont contends that his claims are timely under the discovery rule and based on equitable estoppel.  ECF No. 15 at 20–23.  Additionally, Beaumont claims that the two more recent breaches (i.e., notification of the cease payment in February 2023 and denial of Beaumont's interests in May 2023) should be when the clock started running under the discovery rule.  Id. at 21.  This is because a person of common knowledge and experience would not be on notice that his rights were invaded when Branch acknowledged Beaumont's continuing interests but claimed he could only make monthly payments of $7,500.  Id. at 22.  Moreover, Beaumont argues that defendants' misrepresentations not only make the EKRA-based portion of Beaumont's claims timely under the discovery rule but also estop defendants from asserting the statute of limitations as a defense.  Id. Namely, he asserts that defendants engaged in conduct which amounted to a false representation or concealment of material facts; in so doing, defendants intended that Beaumont would act on those misrepresentations while defendants actually or constructively knew that those were misrepresentations.  Id.  Altogether, Beaumont claims that the court should not opine on the statute of limitations affirmative defense because it is unclear from the face of the complaint whether the claims are time-barred or that tolling could not apply.  Id. at 23.

In reply, defendants argue that the factual allegations of the complaint relate to conduct that allegedly occurred between 2017 and 2019, all of which occurred more than

9

three years before this action was filed. ECF No. 17 at 2. Additionally, the complaint shows that Beaumont knew the conduct underlying his contract-based claims and tort claims at that time. Id. Beaumont failed to act promptly to investigate the applicability of the EKRA when the defendants fixed his monthly payments at $7,500. Id. at 2–3. Defendants further argue that the discovery rule does not toll the statute of limitations. ECF No. 17 at 5–7. South Carolina law provides that discovery of a claim is the baseline for when a statute of limitations runs and similarly provides that discovery means not only actual discovery but also hypothetical discovery of facts a reasonably diligent plaintiff would know. Id. at 6. Consequently, Beaumont had been on notice since the defendants' representations of EKRA on May 23, 2019. Id. Moreover, even Beaumont's representations that he only recently uncovered the facts underlying his claims do not prevent a time bar because he "fail[s] to allege how and when he discovered the alleged misrepresentations."[4] Id. at 7.

At first glance, defendants' arguments seem persuasive. The relevant dates that appear on Beaumont's complaint indicate that the first breach of contract occurred when defendants capped Beaumont's payments to $7,500 on May 23, 2019. Compl. ¶¶ 44, 82. Beaumont filed the instant lawsuit on July 21, 2023, more than four years later. Thus, to

---

[4] "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." Clawson v. FedEx Ground Package Sys., Inc., 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citing United States v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006)); see also Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised" (alteration added)). Defendants first raise the argument that Beaumont has failed to allege how and when he discovered the alleged misrepresentations in their reply brief. ECF No. 17 at 7. The court need not consider that argument because defendants waived it by not raising it in their initial brief.

save his claims from dismissal, Beaumont alleges that even though defendants first breached on May 23, 2019, that breach did not trigger the discovery rule. ECF No. 15 at 22–23. Second, Beaumont contends that if the court disagrees, several tolling doctrines nevertheless save his claims from dismissal: (1) estoppel, and (2) discovery rule tolling. See id. at 22–23.

Equitable estoppel, if proven, "operates to deny a party 'the right to plead or prove an otherwise important fact.'" Maher v. Tietex Corp., 500 S.E.2d 204, 209 (S.C. Ct. App. 1998) (citing Parker v. Parker, 443 S.E.2d 388, 391 (S.C. 1994)). The party asserting estoppel must show "(1) conduct by the party estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the true facts." Id. (citing Brayboy v. Ewing, 428 S.E.2d 731, 732 (S.C. Ct. App. 1993)). That party must also show that he "(1) lack[ed] . . . knowledge and . . . the means of knowledge of the truth as to the facts in question; and (2) reliance upon the conduct of the party estopped." Id. (citing Brayboy, 428 S.E.2d at 732).

Additionally, Beaumont relies on the discovery rule—a doctrine that is briefly discussed above. ECF No. 15 at 22–23. "According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered." Bayle v. S.C. Dep't of Transp., 542 S.E.2d 736, 740 (S.C. Ct. App. 2001). The question is objective, rather than subjective. Joubert v. S.C. Dep't of Soc. Servs., 534 S.E.2d 1 (S.C. Ct. App. 2000). "In other words, whether the particular plaintiff actually knew he had a claim is not the test. Rather, courts must decide whether the circumstances of the case would put a person of common knowledge and experience on

11

notice that some right of his has been invaded, or that some claim against another party might exist." <u>Young v. S.C. Dep't of Corrs.</u>, 511 S.E.2d 413, 416 (S.C. Ct. App. 1999).

The court finds that Beaumont's complaint does not contain sufficient information for it to conclude that his claims are barred by the statute of limitations. He provides facts to account for the gap between the first breach and his filing of the lawsuit. ECF No. 15 at 22–23 (citing Compl. ¶¶ 44–48). To rule in defendants' favor at the motion to dismiss stage, this court would have to conclude that none of the tolling doctrines apply as a matter of law. <u>See</u> <u>Harrell</u>, 517 F. Supp. 3d at 538. Further factual development is needed for the court to be able to rule as much, and, as such, the court denies the motion to dismiss to the extent it is premised on the statute of limitations. Should defendants wish to raise this affirmative defense again, they may do so after discovery, and the court will revisit its analysis. Consequently, the court dispenses with additional analysis of the statute of limitations for Beaumont's contractual claims, SCUTPA claim, and fraud claim.

### 2. Statute of Frauds

The court applies South Carolina law to this analysis.[5] "To satisfy the Statute of Frauds, every essential element of the contract must be expressed in a writing signed by the party to be compelled." <u>Fici v. Koon</u>, 642 S.E.2d 602, 604 (S.C. 2007) (citing <u>Cash</u>

---

[5] The court provides additional analysis later in this order on its determination over whether South Carolina, Florida, or Delaware law applies to the disputed claims. At the hearing, the court asked the parties which law applied. ECF No. 19. Counsel for Beaumont suggested that South Carolina law applied; whereas counsel for defendants indicated their position that Florida law applied to the claims based on the August 2017 Agreement and argued for the first time that Delaware law applied to the membership oppression and failure to provide books and records claims. <u>Id.</u> Ultimately, the court concludes that South Carolina law is the appropriate law to apply. As such, the court cites to South Carolina law throughout.

v. Maddox, 220 S.E.2d 121 (S.C. 1975)); S.C. Code Ann. § 32-3-10.  "The burden of proof is on the party seeking to enforce the contract."  Id.; see also Rainsford v. Apex Bank, 2017 WL 3307647, at *3 (D.S.C. Aug. 3, 2017); Battersby v. Reid, 2021 WL 487364, at *2 (S.C. Ct. App. Feb. 10, 2021).

"South Carolina courts have emphasized that 'the Statute of Frauds applies only to contracts which are impossible of performance within one year.'"  Floyd v. City of Spartanburg, 2022 WL 796819, at *4 (D.S.C. Mar. 16, 2022) (quoting Roberts v. Gaskins, 486 S.E.2d 771, 774 (S.C. Ct. App. 1997)).  "The critical question when determining whether the Statute of Frauds applies is not what the probable, or expected, or actual performance of the contract was, but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year."  Id. (quoting Warner v. Tex. & Pac. Ry. Co., 164 U.S. 418, 434 (1896)) (internal quotation marks omitted).  "If there is a possibility of performance within a year, the contract is not barred by the Statute of Frauds."  Roberts, 486 S.E.2d at 484.  The fact that performance within a year is highly improbable or not expected by the parties does not bring a contract within the scope of this clause.  Id.

South Carolina has enacted the Uniform Electronic Transactions Act (the "SCUETA"), which is clear that "[a]n electronic signature satisfies a law requiring a signature."  S.C. Code Ann. § 26-6-70; accord LA Aviation, LLC v. Skytech, Inc., 2020 WL 13490486, at *5 (D.S.C. Sept. 16, 2020) (noting that the SCUETA has approved the use of email communications as a valid writing and electronic signatures as valid signatures for, inter alia, the statute of frauds).  In other words, "the form of the writing is not material, and may be shown entirely by written correspondence, . . . provided, all of

13

the essential terms of the contract can be gathered from the correspondence or some other writing to which it refers, without resort to parol testimony." See Barr v. Lyle, 211 S.E.2d 232, 234 (S.C. 1975) (internal citations omitted).

Defendants contend that Beaumont cannot satisfy the statute of frauds for either the August 2017 Agreement or the September 2017 Agreement because lifelong payments could not be performed within a year, and Beaumont has not presented a written agreement that could support such an arrangement. ECF No. 14-1 at 10–11.

Beaumont disagrees on both counts. ECF No. 15 at 24–26. First, Beaumont argues that the statute of frauds does not apply since both contracts were performable within a year. Id. at 24. Under South Carolina law, a member holds a distributional interest in the LLC which is personal property. Id. Therefore, when Beaumont paid the $250,000, he received the bargained-for exchange and profit interests in the laboratory ventures because the personal property—the distributional interest in the LLC—was transferred within the space of two months. Id. Beaumont further explains that even if the court were to consider the corresponding payments, the agreements were still performable within a year because the laboratory ventures could have failed within the first year—thus, they were fully performable within a year even if such performance were unlikely. Id. at 24–25.

Second, Beaumont contends that he "has alleged the existence of sufficient writings to satisfy [the statute of frauds]." Id. at 25. Under South Carolina law, the form of the writing is not material and can be shown entirely by written correspondence—of which there is sufficient correspondence both through email and the several years of monthly signed checks to indicate that the statute of frauds does not apply. Id. at 25–26

& n.132.  In any event, Beaumont concludes that the applicability of the affirmative defense is not clear from the face of the complaint and thereby should not be considered on a motion to dismiss.  Id. at 26.  Finally, Beaumont argues that defendants should be estopped from asserting a statute of frauds defense because there is competent proof of the existence of the contracts and there is evidence that Beaumont went into debt and invested his entire net worth for the promised chance of the laboratory ventures' success.  Id.

In reply, defendants claim that "[t]he critical question when determining whether the Statute of Frauds applies 'is not what th[e] probable, or expected, or actual performance of the contract was, but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year."  ECF No. 17 at 8 (quoting Warner, 164 U.S. at 434).  The factual allegations and requested relief in this case belie any argument that both agreements were performable within one year.  Id.  Specifically, defendants point to the language that says Beaumont will receive payments of "1.5% of gross profits from Avante, MedCoast, Vikor, and any other laboratory ventures Mr. Branch and Ms. Harrelson have, had, or will have in the future."  Id. (quoting Compl. ¶¶ 63, 70, 76).  Additionally, defendants highlight that Beaumont's requested relief is "a percentage of ownership interest in Defendants' future laboratory ventures," and the terms of the agreement encompass laboratory ventures not yet in existence at the time the contract was executed.  Id. at 9.  Finally, defendants argue that there is no basis for Beaumont's estoppel argument because, for the estoppel doctrine to be invoked, there must be competent proof of the existence of the oral contract, and the

party asserting estoppel must be able to show he suffered a definite, substantial, detrimental change of position in reliance on that contract. Id. at 11.

Initially, the court finds it debatable whether Beaumont has plausibly stated that the August 2017 Agreement satisfies the statute of frauds; whereas the court concludes that Beaumont has plausibly stated that the September 2017 Agreement satisfies the statute of frauds. See Cash v. Maddox, 220 S.E.2d 121, 122 (S.C. 1975). The court starts by examining the August 2017 Agreement. Beaumont included an attachment to the complaint entitled "Sales Representative Employment Agreement," ECF No. 1-1, which he later clarified was not the August 2017 Agreement, but rather evidence of the intent of the August 2017 Agreement, ECF No. 15 at 13. Beaumont has not since provided a separate written agreement, or evidence of an email exchange establishing a written agreement, that can satisfy the requirement that there "be a writing signed by the party against whom enforcement is sought," as it relates to the August 2017 Agreement. See Springob v. Univ. of S.C., 757 S.E.2d 384, 387 (S.C. 2014).

In contrast, the court finds that Beaumont has stated facts that plausibly establish the existence of a contract that satisfies the statute of frauds for the September 2017 Agreement. Beaumont included a signed attachment to his complaint which set forth the terms of the agreement. ECF No. 1-2. Beaumont's signature is the only one clearly on the written agreement. See id. But that is not dispositive, because Beaumont has plausibly established that it was sent through email from Branch, which satisfies the requirement of a signature under SCUETA. See S.C. Code Ann. § 26-6-70(A) (establishing that a "signature must not be denied legal effect or enforceability solely

16

because it is in electronic form"); see also Traynum v. Scavens, 786 S.E.2d 115, 120 (S.C. 2016).

Nevertheless, the court's initial conclusion that Beaumont has not identified a writing sufficient to satisfy the statute of frauds for the August 2017 Agreement is not fatal to those claims, particularly because the statute of frauds is an affirmative defense. "[T]he doctrine of estoppel may be invoked to prevent a party from asserting the statute of frauds." Collins Music Co. v. Cook, 316 S.E.2d 418, 420 (S.C. Ct. App. 1984) (citing Florence Printing Co. v. Parnell, 182 S.E. 313, 316 (S.C. 1935)). "The party asserting estoppel 'must show that he has suffered a definite, substantial, detrimental change of position in reliance on the contract, and that no remedy except enforcement of the bargain is adequate to restore his former position.'" Springob, 757 S.E.2d at 388 (quoting Collins Music Co., 316 S.E.2d at 420). "It is not sufficient to show merely that he has lost an expected benefit under the contract." Id. "Before the estoppel doctrine can be invoked, however, there must be competent proof of the existence of the oral contract." Id. (quoting Atl. Wholesale Co. v. Solondz, 320 S.E.2d 720, 723 (S.C. Ct. App. 1984)).

The court finds that even if there is no signed writing sufficient to satisfy the requirements of the statute of frauds, Beaumont has nevertheless plausibly stated facts which could give rise to the doctrine of estoppel. Namely, the parties' course of dealing shows that the parties agree that Beaumont gave defendants—or at least Harrelson and Branch—$250,000 and, in exchange, Beaumont was paid monthly for years. See Compl. ¶¶ 15–26, 29–51; ECF No. 14-1 at 2; ECF No. 15 at 2. Certainly, the parties dispute whether the monthly deposits were repayment of debt or profits that reflected Beaumont's equity in the enterprises. Nevertheless, a contract existed between the

parties—whether oral or written—and it is similarly clear that Beaumont paid Branch and Harrelson $250,000, which he avers was his entire net worth at that time. Thus, taken together, these facts are sufficient to create an issue of material fact as to whether Beaumont "suffered a definite, substantial, and detrimental change in reliance on these purported oral representations." Springob, 757 S.E.2d at 388. As such, the court denies defendants' motion to dismiss to the extent it is premised on the statute of frauds.

The court finds that neither of the asserted affirmative defenses are clearly applicable on the face of the complaint such that the complaint, or claims within it, warrant dismissal. The court next considers whether Beaumont has plausibly stated facts giving rise to the eleven claims included in his complaint.

### B. Claims Premised on the August 2017 Agreement

The court first determines what law to apply to the dispute before evaluating whether Beaumont has plausibly stated facts sufficient to survive a motion to dismiss for those claims premised on the August 2017 Agreement. Initially, the parties agree that dismissal of implied covenant claim is warranted; consequently, the court dismisses that claim. The court finds that South Carolina law applies to the claims premised on the August 2017 Agreement and thereafter concludes that Beaumont has plausibly stated facts which give rise to breach of contract and breach of contract accompanied by fraudulent act causes of action.

#### 1. Choice of Law

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 599–600 (4th Cir.

18

2004).  "Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law."  Nucor Corp. v. Bell, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) (citing Bazzle v. Green Tree Fin. Corp., 569 S.E.2d 349, 358 (S.C. 2002), vacated on other grounds 539 U.S. 444 (2003); accord Team IA, Inc. v. Lucas, 717 S.E.2d 103, 108 (S.C. Ct. App. 2011) ("Choice of law clauses are generally honored in South Carolina.").  The attachment included with the complaint entitled "Sales Representative Employment Agreement" includes a provision that specifies that "[t]his Agreement shall be construed and interpreted in accordance with the laws of the State of Florida."  ECF No. 1-1 at 10.  However, in his response in opposition, Beaumont clarifies that his inclusion of the "Sales Representative Agreement" was not to provide a written contract, but rather to evidence the separate existing agreement—the August 2017 Agreement—between the parties.  ECF No. 15 at 13.  As such, Beaumont contends that the document's Florida choice-of-law and employment provisions are inapplicable.  Id. at 14.

In the absence of a choice of law provision, South Carolina courts apply the substantive law of the place where the contract at issue was formed if the parties challenge a contract's formation, interpretation, or validity.  See, e.g., O'Briant v. Daniel Constr. Co., 305 S.E.2d 241, 243 (S.C. 1983).  However, where performance is at issue, the law of the place of performance governs.  Livingston v. Atl. Coast Line R.R. Co., 180 S.E. 343, 345 (S.C. 1935).  In the complaint, Beaumont specifies that he negotiated and entered the agreement in Florida, while Branch and Harrelson did so in South Carolina.  Compl. ¶ 72.  Moreover, defendants' payment decisions and purported misrepresentations were made in and from South Carolina, where Vikor and MedCoast

19

are incorporated, and where defendants conducted the business out of which this claim arises.  Id.  Thus, it would be appropriate to apply either Florida or South Carolina law to this contract because the parties formed and performed the contract in both states.  See O'Briant, 305 S.E.2d at 243; Livingston, 180 S.E. at 345.  Beaumont includes claims based on South Carolina law elsewhere in his complaint and indicated his belief that South Carolina law applies at the hearing.  See, e.g., Compl. ¶¶ 120–24; ECF No. 19.  Consequently, the court applies South Carolina law in the absence of an explicit provision to the contrary.

### 2.  Breach of Contract

To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage as a direct and proximate result of the breach.  See King v. Carolina First Bank, 26 F. Supp. 3d 510, 517 (D.S.C. 2014) (applying South Carolina law).  Damages recoverable for a breach of contract must either flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract.  Hawkins v. Greenwood Dev. Corp., 493 S.E.2d 875, 880 (S.C. Ct. App. 1997); Morningstar Fellowship Church v. York Cnty., 2018 WL 2979771, at *1 (S.C. Ct. App. 2018).  To prevail on a breach of contract claim, the plaintiff bears the burden of establishing the three elements of that claim.  See Ferguson v. Waffle House, Inc., 18 F. Supp. 3d 705, 731 (D.S.C. 2014) (citing Fuller v. E. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

In their motion to dismiss, defendants provide two arguments to conclude that Beaumont has not met the plausibility standard to plead a breach of contract claim for the

August 2017 Agreement.  First, defendants challenge whether the August 2017

Agreement was ever formed.  ECF No. 14-1 at 5.  Second, defendants argue that

Beaumont "cannot present a viable allegation of material breach," because his allegations

of breach do not match the express terms of the attached "Sales Representative

Employment Agreement," ECF No. 1-1.  Id. at 7.

   In response, Beaumont contends that a contract was clearly formed as evidenced

by the parties' course of dealing: namely, that Beaumont clearly invested $250,000 into

Branch and Harrelson's business and in exchange, Branch and Harrelson sent him

distributions for more than five years.  ECF No. 15 at 5.  This course of dealing "renders

Mr. Beaumont's claims entirely plausible."  Id. at 12.  Beaumont further contends that

defendants have failed to identify or reference "a note, interest, security, default

provisions, or any other indicia of a loan to support [the inference that the payments were

loans rather than investments in equity]."  Id.  Accepting Beaumont's well-pleaded

factual allegations as true, he argues that the complaint "clearly alleges the existence and

breach of both Agreements."  Id. at 13.

   In reply, defendants contend that none of the named defendants are parties to the

Sales Representative Employment Agreement, ECF No. 1-1, nor are there any allegations

in the complaint that any provision of that document would be enforceable against any

named defendant.  ECF No. 17 at 4.  Additionally, defendants argue that even if the court

were to construe that document as evidence of a separate contractual agreement—the

August 2017 Agreement—the breach of contract claim remains defective because

Beaumont "fails to allege facts to explain how an alleged lifelong partnership with

Defendants or ownership in any companies [] arise out of an employment agreement he

had with a non-party." Id.  The complaint therefore "does not begin to contain a factual basis that would rise above the level of 'mere speculation.'" Id.

Initially, the court notes that defendants' emphasis on the attached "Sales Representative Employment Agreement," ECF No. 1-1, in their motion, reply, and at the hearing is misplaced because Beaumont has consistently stated that he included the attachment merely to evidence the existence of the wholly distinct August 2017 Agreement.  Bearing that in mind, the court finds that Beaumont has pleaded facts that plausibly state a breach of contract claim based on the August 2017 Agreement.  First, the court finds that Beaumont has plausibly alleged that a contract was formed.  Based on the facts alleged in the complaint, Beaumont fully performed his half of the bargain and made a $100,000 payment in exchange for 1.5% of gross profits from Branch and Harrelson's laboratory ventures.  Compl. ¶¶ 17–19.  Beaumont thereafter received payments directly from NCF and later from Harrelson which an online portal temporarily verified accounted for 1.5% of all gross profits. [6]  Id. ¶¶ 29–34.  Second, the court concludes that Beaumont has plausibly alleged that defendants breached the August 2017 Agreement when they no longer disbursed payments accounting for 1.5% of gross profits—instead providing $7,500 per month to Beaumont as his payment for both the

---

[6] Beaumont provides two examples which suggest that the parties had a meeting of the minds to support his contention that a contract was formed.  ECF No. 15 at 15–17.  First, the only rationale behind defendants' citing to EKRA would be because all parties believed Beaumont was entitled to payments based on a portion of revenues and because EKRA is wholly inapplicable to loans.  Id. at 15–16.  Second, Vikor's continuous payments and Diamiano's statement indicate that all parties agree that Beaumont had an interest in the company entitling him to continued distributions at least up until the restructuring.  Id. at 16.  Thus, the court finds that Beaumont has plausibly stated that the parties had a meeting of the minds as to the material terms of the contract, since the course of dealing reflects unanimity as to the contract's interpretation, at least when the contract was initially performed.

August 2017 Agreement and the September 2017 Agreement for nearly three years—and thereafter indicated an intention to cease all payments entirely.[7]  Id. ¶¶ 44, 49, 51–52. Third, the court finds that Beaumont has plausibly alleged that the identified damages of not being paid his full share of the 1.5% of gross profits from the laboratory ventures was directly and proximately caused by the breach.  As such, the court denies defendants' motion to dismiss as to Beaumont's claim of breach of the August 2017 Agreement.

### 3.  Breach of Contract Accompanied by Fraudulent Act

To successfully bring a claim for breach of contract accompanied by a fraudulent act, the plaintiff must establish three elements: (1) breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach.  See Conner v. City of Forest Acres, 560 S.E.2d 606, 612 (S.C. 2002).  Motive is relevant to the requisite element of fraudulent intent and is typically proven by circumstances surrounding the breach.  Edens v. Goodyear Tire & Rubber Co., 858 F.2d 198, 203 (4th Cir. 1988).  The fraudulent act is any act characterized by dishonesty in fact or unfair dealing.  Id.  The court must determine the existence of fraud considering the facts and peculiar circumstances present in the case.  In

---

[7] Beaumont claims that he has sufficiently alleged both the August 2017 Agreement's existence and that it was breached three times over.  ECF No. 15 at 16. Beaumont fully performed his part of the bargain by providing a $100,000 investment. Id.  Before the company transitioned to Vikor, Branch, Harrelson, Avante, and MedCoast breached by failing to pay Beaumont the entire 1.5% of gross profits that he bargained for in exchange.  Id.  After the transition to Vikor, defendants purportedly further breached by failing to pay the full and agreed upon 1.5% of gross profits, which the defendants' perpetrated by lying to Beaumont regarding the applicability of EKRA and otherwise making only partial payment.  Id. at 16–17.  Finally, defendants breached again by threatening to imminently cease making payments before disavowing Beaumont's interest in the company outright.  Id. at 17.  As such, there was a binding contract and breach of that contract.  Id.  These are the facts that the court references when concluding that Beaumont has plausibly stated facts which establish that a breach occurred.

re Ducane Gas Grills, Inc., 320 B.R. 341, 355 (Bankr. D.S.C. 2004). "[M]ere breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue of punitive damages." Paul L. Kennedy Enters. v. Manganaro Se., LLC, 2023 WL 1420030, at *4 (D.S.C. Jan. 31, 2023).

Courts in this district have widely held that a claim for breach of contract accompanied by a fraudulent act is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See, e.g., Lima One Cap. LLC v. DAC Acquisitions LLC, 2020 WL 5816739, at *3 (D.S.C. Sept. 30, 2020); Parks v. Liberty Ins. Corp., 2017 WL 11457907, at *5 (D.S.C. May 18, 2017); Davis v. CitiMortgage, Inc., 2016 WL 4040084, at *3 (D.S.C. July 28, 2016). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Only "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Id. In practice, this means that a plaintiff alleging fraud must plead "the who, what, when, where, and how of the alleged fraud." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (quoting United States ex rel. Willard v. Humana Health Plan of Tex., Inc., 336 F.3d 375, 384 (5th Cir. 2003)). The pleading standard of Rule 9(b) requires a party to "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc., 888 F.3d 696, 705 (4th Cir. 2018) (quoting Wilson, 525 F.3d at 379) (internal quotation marks omitted). A party's "lack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." Harrison v. Westinghouse Savannah River Co.,

176 F.3d 776, 783 n.5 (4th Cir. 1999) (citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 901 (5th Cir. 1997)).

Initially, the court notes that since it found that Beaumont provided facts that plausibly stated a breach of contract action, the first element of breach of contract accompanied by fraudulent act is met. Thus, the court is tasked with determining whether Beaumont has also stated facts which plausibly meet the requirements for the second and third elements of the action.

For the second element, it is debatable whether Beaumont has stated facts which show "[f]raudulent intent relating to the breaching of the contract and not merely to its making." Floyd v. Country Squire Mobile Homes, Inc., 336 S.E.2d 502, 503 (S.C. Ct. App. 1985). In general, motive for the breach is relevant to the element of fraudulent intent, which is proven by circumstances surrounding the breach. Edens, 858 F.2d at 203. Beaumont's complaint specifies that on May 23, 2019, roughly one month after resuming payments, Branch emailed Beaumont and said "the law has now been enforced (EKRA) meaning we can no longer pay per sample or tied to revenues. With that said, we will honor our word but the payment will be set at 7500 monthly every month moving ahead." Compl. ¶ 44. It is unclear from the complaint whether Branch and Harrelson intended to defraud Beaumont of his payments, or if they merely made a mistake of law. Beaumont asks the court to infer that the misrepresentation was "willful[], wanton[], or at the very least, reckless[]." Id. ¶ 45. In his cause of action, Beaumont contends that defendants' breaches were accomplished by fraudulent intention, including:

    a.  Restructuring and continuing to restructure the laboratory ventures in an attempt to terminate Mr. Beaumont's interests;

    b.  Removing Mr. Beaumont's access to the online portal to conceal the true amount of gross profits;

25

    c. Misrepresenting to Mr. Beaumont that EKRA capped his payments at $7,500 per month;

    d. Intending that Mr. Beaumont would rely on their concealments and misrepresentations, first by accepting shorted or missed payments, then by accepting the artificially lowered monthly payment, and finally by accepting that his payments would cease altogether.

Id. ¶ 108. Beaumont primarily rests his assertion on Harrelson and Branch's email which incorrectly indicated that EKRA applied such that Beaumont's investments had to be reduced, but he does not clearly connect the dots to show fraudulent intent. See id. ¶¶ 44–49. Nevertheless, the court finds that Beaumont has sufficiently stated facts which enable this claim to reach discovery, because under Rule 9(b) the intent requirement may be alleged generally. See Fed. R. Civ. P. 9(b).

    As for the third element, Beaumont has pleaded facts which plausibly indicate "[a] fraudulent act accompanying the breach." Country Squire Mobile Homes, 336 S.E.2d at 504. "The fraudulent act is any act characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design." Edens, 858 F.2d at 203. The court finds that Beaumont has plausibly stated a fraudulent act accompanying the breach whereby Branch and Harrelson misrepresented that EKRA applied to the August 2017 Agreement such that they were able to reduce payments to Beaumont, which, in turn, breached the contract. Compl. ¶¶ 108–09. In other words, the court finds that Beaumont has alleged the "who, what, when, where, and how of the alleged fraud." See Kellogg Brown & Root, Inc., 525 F.3d at 379.

    In sum, the court denies defendants' motion to dismiss Beaumont's breach of contract accompanied by fraudulent act claim based on the August 2017 Agreement.

#### 4. Breach of Implied Covenant

In their motion, defendants argue that neither South Carolina nor Florida law recognizes an independent claim for breach of the implied covenant of good faith and fair dealing.  ECF Nos. 14 ¶¶ 3–4; 14-1 at 10–11 (citing Burger King Corp. v. Weaver, 169 F.3d 1310, 1317–18 (11th Cir. 1999); RoTec Servs. Inc. v. Encompass Servs., Inc., 597 S.E.2d 881, 884 (S.C. Ct. App. 2004)).  In his response in opposition, Beaumont agrees with defendants that his implied covenant claims are mislabeled and should be construed as part of the corresponding breach of contract claims.  ECF No. 15 at 1.  Thus, the court grants the motion to dismiss as to the breach of implied covenant claim, Beaumont's third cause of action, but preserves any arguments or facts underlying this action for his breach of contract claim regarding the August 2017 Agreement.

#### C. Claims Premised on the September 2017 Agreement

Much of this analysis will mirror the analysis provided for the August 2017 Agreement, but the court evaluates the arguments separately because of the disputes over choice of law.  Thus, the court will review whether South Carolina versus Delaware law applies before considering the three claims premised on the September 2017 Agreement. Initially, the parties agree that dismissal of implied covenant claim is warranted; as such, the court dismisses that claim.  The court finds that South Carolina law applies to the claims premised on the September 2017 Agreement and thereafter concludes that Beaumont has plausibly stated facts which give rise to a breach of contract and breach of contract accompanied by fraudulent act cause of action.

### 1.  Choice of Law: South Carolina or Delaware

Defendants note that the September 2017 Agreement contains no choice of law provision, but the complaint indicates that Beaumont believes South Carolina law should apply.  ECF No. 14-1 at 7 (citing Compl. ¶ 84).  Defendants imply in a footnote that since Avante incorporated in Delaware as a limited liability company, Delaware law should apply.[8]  ECF No. 14-1 at 9 n.2 (citing Del. Code Ann. Tit. 10, § 8106).  Also responding in a footnote, Beaumont contends that defendants cite no case in support of their contention that Delaware law applies merely because Avante was incorporated in Delaware.  ECF No. 15 at 20–21 n.114.  Moreover, South Carolina choice of law rules explain that the law of the place of performance governs, which was unspecified for the September 2017 Agreement though Branch executed the contract from South Carolina and Beaumont executed it from Florida.  Id.

The court reaches the same conclusion it did for the August 2017 Agreement and concludes that under South Carolina choice-of-law rules either Florida or South Carolina law should apply because the parties formed and performed the contract in both states.  See O'Briant, 305 S.E.2d at 243; Livingston, 180 S.E. at 345.  Upon review, defendants have not cited, the court has not found, any cases which apply Delaware law merely because a company is incorporated in Delaware.  See ECF No. 14-1 at 9 n.2.  As such, based on Beaumont's preference, the court applies South Carolina law for the September 2017 Agreement, as well as for all challenged claims.

---

[8] At the hearing, counsel for the defendants appeared to pivot from this assertion and instead noted that South Carolina law would apply to this contract.  ECF No. 19.  Counsel for the defendant thereafter asserted for the first time that Delaware law should apply to the member oppression and failure to provide access to books and records claims, presumably on the same basis they included in their original footnote.  Id.

### 2. Breach of Contract

To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage as a direct and proximate result of the breach.  See King, 26 F. Supp. 3d at 517.

First, defendants argue that the September 2017 Agreement did not confer an equity partnership stake.  ECF No. 14-1 at 4.  Rather, it related to "a portion of the partnership of the commercialization of the entity," which is different from having ownership in a company because "ownership requires responsibilities and disclosures on tax returns that Beaumont has never undertaken."  Id.  In that vein, defendants refer to the September 2017 Agreement as the "Avante Commercialization Letter."  Id.  Second, defendants argue that Beaumont fails to state facts that plausibly establish "the existence of a binding contract between Beaumont and Defendants."  Id. at 8.  Specifically, the letter does not reference or mention MedCoast and Vikor was not established until almost eight months later.  Id.  Moreover, defendants contend that formation was defective because there was "no offer, acceptance, [or] valuable consideration" because Beaumont had already advanced funds to Branch prior to signing the identified letter, and the document itself omits any reference to those terms.  Id.  Formation was purportedly also defective because there was no meeting of the minds as to the material terms.  Id.

In response, Beaumont provides many of the same arguments he provided to support his allegation of contract formation and breach of the August 2017 Agreement.  See ECF No. 15 at 17–20.  First, Beaumont contends that the September 2017 Agreement is a valid, binding contract between him and Avante, MedCoast, and Vikor, because it

29

clearly provides that it is transferable with any new laboratory that is built or purchased by Avante. Id. at 17; ECF No. 1-2 ("This agreement will be and is transferrable with any new lab that is built or purchased by Avante Diagnostics."). Moreover, the agreement specifies that it is "the active agreement in principal as it regards to molecular specialty testing," ECF No. 1-2, which Vikor is still engaged in. Id. Beaumont further argues that any ambiguity in the agreement must be construed against Branch as the drafter and, moreover, the agreement does not contain an integration clause. Id. at 18. Additionally, course of dealing indicates that Branch and Beaumont "performed consistent with their intent that Mr. Beaumont would receive 15% of Mr. Branch's partnership interest in the laboratory ventures and any companies to which they expanded or transitioned, including Vikor." Id. Vikor's later statement that payments to Beaumont would cease because the company was "transitioning the business and will soon be undergoing a restructuring of ownership" implies that prior to the restructuring, Beaumont had an interest in the company. Id. at 18–19. Additionally, though Beaumont signed the September 2017 Agreement after he had already advanced funds, that fact does not divest the agreement of adequate consideration because Beaumont made at least one $50,000 payment the day after he executed the agreement. Id. at 19–20. Second, Beaumont contends that he has plausibly stated that the defendants breached the agreement because Beaumont fully performed by providing the $150,000 investment in exchange for fifteen percent of Branch's partnership interest in the laboratory ventures and any companies to which they expanded or transitioned. Id. at 19. Branch therefore breached when he unilaterally combined his payments under the September 2017 Agreement with those under the August 2017 Agreement and when he capped those payments at $7,500. Id. As such,

Beaumont argues that he has plausibly alleged a breach of contract claim as it relates to the September 2017 Agreement sufficient to survive a motion to dismiss.  Id. at 20.

In reply, defendants argue that the contract claims against Avante, MedCoast, and Vikor pursuant to the September 2017 Agreement "fail because a party unknowingly named in an alleged contract 'clearly fails to satisfy the meeting of the minds element.'"  ECF No. 17 at 5 (quoting Quintech Sec. Consultants, Inc. v. Intralot USA, Inc., 2011 WL 5105446, at *3 (D.S.C. Oct. 27, 2011)).  Additionally, "[t]here are no factual allegations to show a meeting of the minds as to the work to be performed by Beaumont or obligations entitling him to receive lifelong, perpetual payments.  Id.  Consequently, Beaumont's breach of contract claim based on the September 2017 Agreement should be dismissed for failure to state a claim.  Id.

The court finds that Beaumont has pleaded facts that plausibly state a breach of contract claim based on the September 2017 Agreement.  First, the court concludes that Beaumont has plausibly alleged that a contract was formed.  Based on the facts alleged in the complaint, Beaumont fully performed his half of the bargain and made a $150,000 payment in exchange for fifteen percent of Branch's partnership interest in the laboratory ventures.  Compl. ¶¶ 20–25.  Beaumont has provided the court with a written agreement from Branch attesting to that understanding executed on September 20, 2017, and, in exchange, Beaumont provided the final payment of $50,000 the following day.  Id. ¶¶ 24–25; ECF No. 1-2.  Beaumont thereafter received payments directly from Branch for that partnership portion.  Compl. ¶¶ 29–34.  Second, the court finds that Beaumont has plausibly alleged that defendants breached the September 2017 Agreement when defendants no longer disbursed payments accounting for fifteen percent of Branch's

partnership interest—instead providing $7,500 per month to Beaumont as his payments for both the August 2017 Agreement and the September 2017 Agreement for nearly three years—and thereafter indicated an intention to cease all payments entirely.  Id. ¶¶ 44, 49, 51–52.  Third, the court finds that Beaumont has plausibly alleged that the identified damages of not being paid his full share of the fifteen percent of Branch's partnership interest from the laboratory ventures was directly and proximately caused by the breach. As such, the court denies defendants' motion to dismiss Beaumont's claim of breach of the September 2017 Agreement.

### 3.  Breach of Contract Accompanied by Fraudulent Act

As the court has previously stated, to successfully bring a claim for breach of contract accompanied by a fraudulent act, the plaintiff must establish three elements: (1) breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach.  See Conner, 560 S.E.2d at 612.

Defendants contend that because Beaumont has not identified facts which plausibly state a claim for breach of contract, he similarly has not met the plausibility standard for breach of contract accompanied by fraudulent act.  ECF No. 14-1 at 16. Additionally, defendants claim that the complaint fails to allege with particularity the existence of a fraudulent intent and fraudulent act.  Id.  Moreover, where the fraudulent act is a misrepresentation, defendants contend that a plaintiff must prove reliance.  Id. (citing Paul L. Kennedy Enters., 2023 WL 1420030, at *4).

Initially, the court notes that since it found that Beaumont provided facts that plausibly stated a breach of contract action, the first element of breach of contract

accompanied by fraudulent act is met.  Thus, the court is tasked with determining whether Beaumont has also stated facts which plausibly meet the requirements for the second and third elements of the action.

For the second element, it is debatable whether Beaumont has stated facts which show "[f]raudulent intent relating to the breaching of the contract and not merely to its making." Country Squire Mobile Homes, 336 S.E.2d at 503.  In general, motive for the breach is relevant to the element of fraudulent intent, which is proven by circumstances surrounding the breach. Edens, 858 F.2d at 203.  In his complaint, Beaumont contends that defendants' breaches were accomplished by fraudulent intention, including:

a. Restructuring and continuing to restructure in an attempt to terminate Mr. Beaumont's interest under the September 2017 Investment Agreement;

b. Misrepresenting to Mr. Beaumont that EKRA capped his payments at $7,500 per month;

c. Intending that Mr. Beaumont would rely on the EKRA misrepresentation by accepting the single, artificially lowered monthly payment in lieu of the exponentially greater monthly payments he was entitled to;

d. Intending that Mr. Beaumont would rely on the misrepresentation that Vikor's current or upcoming restructuring would terminate his 15% interest.

Compl. ¶ 117.  The court finds that Beaumont has plausibly stated facts which enable this claim to reach discovery.

As for the third element, Beaumont has pleaded facts which plausibly indicate "[a] fraudulent act accompanying the breach." Country Squire Mobile Homes, 336 S.E.2d at 504.  "The fraudulent act is any act characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design." Edens, 858 F.2d at 203.  The court finds that Beaumont has plausibly stated a fraudulent act

33

accompanying the breach whereby Branch and Harrelson misrepresented that EKRA

applied to the September 2017 Agreement such that they were able to reduce payments to

Beaumont, which, in turn, breached the contract. Compl. ¶¶ 108–09. Beaumont has

identified additional fraudulent acts, "including restructuring in an attempt to sever Mr.

Beaumont's interests, threatening to cease payments due to Mr. Beaumont, leaving Mr.

Beaumont severely short of the payment [] he was due, and maintaining funds [owed] to

Mr. Beaumont for their own use." Id. ¶ 118. Finally, the court finds that Beaumont has

plausibly stated facts which indicate his reliance on the misrepresentation—namely,

accepting only $7,500 per month when he previously received almost three times that

amount, which makes sense if he relied on defendants' representation that it would be

against the law for him to receive more. See Kelly v. Nationwide Mut. Ins. Co., 298

S.E.2d 454, 455(S.C. 1982) (recognizing that for a breach of contract accompanied by

fraudulent act claim based on a misrepresentation, the plaintiff must also prove reliance

on the misrepresentation); Vann v. Nationwide Ins. Co., 185 S.E.2d 363 (S.C. 1971)

(same). Thus, since Beaumont has plausibly stated facts which meet the three elements

of a breach of contract accompanied by fraudulent act cause of action, this claim survives

defendants' motion to dismiss.

### 4. Breach of Implied Covenant

In their motion, defendants argue that South Carolina law does not recognize the

implied covenant of good faith and fair dealing as an independent cause of action

separate from the claim for breach of contract. ECF No. 14-1 at 11. In his response in

opposition, Beaumont agrees with defendants that his implied covenant claims are

mislabeled and should be construed as part of the corresponding breach of contract

claims.  ECF No. 15 at 1.  Thus, the court grants the motion to dismiss as to the breach of

implied covenant claim, Beaumont's fourth cause of action, but preserves any arguments

or facts underlying this action for his breach of contract claim regarding the September

2017 Agreement.

### D.  Miscellaneous Relief

The court finally turns to Beaumont's claims of fraud, violations of SCUTPA,

member oppression, failure to provide books and records, and successor liability.

#### 1.  Fraud

"Fraud is an intentional perversion of truth for the purpose of inducing another in

reliance upon it to part with some valuable thing belonging to h[im] or to surrender a

legal right."  Moseley v. All Things Possible, Inc., 694 S.E.2d 43, 45 (S.C. Ct. App.

2010) (quoting Regions Bank v. Schmauch, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003)),

aff'd 719 S.E.2d 656 (S.C. 2011).  To prevail on a cause of action for fraud, a plaintiff

must prove each of the following elements "by clear, cogent, and convincing evidence":

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge
> of its falsity or a reckless disregard of its truth or falsity; (5) intent that the
> representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the
> hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9)
> the hearer's consequent and proximate injury.

Schmauch, 582 S.E.2d at 444–45.  "The failure to prove any element of fraud . . . is fatal

to the claim."  Schnellmann v. Roettger, 645 S.E.2d 239, 241 (S.C. 2007) (per curiam).

Although this claim arises under state law, fraud claims are subjected to heightened

pleading requirements in federal court, particularly when affirmative misrepresentations

are alleged.  Fed. R. Civ. P. 9(b).  In interpreting Rule 9(b), courts have found "that a

plaintiff alleging fraud must make particular allegations of the time, place, speaker, and

contents of the allegedly false acts or statements."  Mincey v. World Savs. Bank, FSB,

614 F. Supp. 2d 610, 626 (D.S.C. 2008) (quoting <u>Adams v. NVR Homes, Inc.</u>, 193

F.R.D. 243, 249–50 (D. Md. 2000)).  "A complaint failing to specifically allege the time,

place, and nature of the fraud is subject to dismissal pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure."  <u>Id.</u>

     Defendants claim that the complaint fails to state the fraud claims with

particularity and, even if that were not the case, defendants contend that the fraud claim is

time-barred.  ECF No. 14-1 at 12.  The court considered and rejected defendants'

argument that the claim is time-barred previously, therefore it now confines its analysis to

whether Beaumont has stated facts which meet the Rule 9(b) particularity standard

required for fraud claims.

     Defendants argue that the fraud claim fails to state facts which plausibly meet the

elements of a fraud claim, much less facts which meet the particularity standard, where

the claim "is based on a legal conclusion that the EKRA is 'inapplicable' to Beaumont

because he was not a source of lab referrals."  ECF No. 14-1 at 13.  Beaumont identifies

the elements of a fraud claim and contends that he "has alleges the precise date, contents,

and makers of the misrepresentations underlying his fraud claim as well as what they

obtained thereby—all the money that they severely shorted Mr. Beaumont in order to

enrich themselves."  ECF No. 15 at 27.

     Initially, the court notes that it is well established that "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally" and still

meet the particularity standard.  Fed. R. Civ. P. 9(b).  Thus, defendants' argument for the

claim's dismissal because it does not allege any facts "to explain how Defendants would

have known that Branch's interpretation of the EKRA was false while Beaumont could

be ignorant of the same," is unpersuasive because those omitted facts speak to the intent

requirement.  See ECF No. 14-1 at 13.  However, defendants are correct: "it is a

recognized and long established principle of law that generally fraud cannot be predicated

on misrepresentation as to matters of law, much less on mere mistake of law."  First Nat'l

Bank of Greenville, 35 S.E.2d at 59; accord Barber v. Barber, 353 S.E.2d 882, 883 (S.C.

Ct. App. 1987); Anderson Cnty. v. Preston, 804 S.E.2d 282, 292 (S.C. Ct. App. 2017),

vacated on other grounds, 831 S.E.2d 911 (S.C. 2019).  Thus, defendants'

misrepresentation of EKRA cannot form a basis for Beaumont's fraud claim.  See id.

Though Beaumont appears to concede as much, he contends that an exception to the rule

might apply, though he does not clearly explain what exception might apply or how his

facts are analogous to the cases he cites where courts found exceptions.[9]  See ECF No. 15

---

[9] In his footnotes, Beaumont cited several cases.  See ECF No. 15 at 29 nn.149–
151.  However, the court's review of those cases leads it to conclude that they are
distinguishable from the instant facts. See, e.g., Slack v. James, 614 S.E.2d 636, 639
(S.C. 2005) (finding a question of fact existed as to whether the homebuyer's reliance on
the house seller's misrepresentation was reasonable although falsity of the representation
could have been ascertained by examining the public records); Unlimited Servs., Inc. v.
Macklen Enters., 401 S.E.2d 153, 155 (S.C. 1991) (finding that because nothing put the
restaurant purchaser on notice that there was a problem with the access, the question of
reliance and its reasonableness was a jury issue for plaintiff's claim of fraudulent
misrepresentations and deceit); Florentine Corp. v. PEDA I, Inc., 339 S.E.2d 112, 114
(S.C. 1985) (finding that the renters had no right to rely on the landlord's fraudulent
misrepresentations that the shop would have no direct competition at that mall,
particularly when the representation was made during the pre-contract negotiation stage
and the renter had an attorney review the document prior to signing); Koon v. Pioneer-
Pyramid Life Ins. Co., 178 S.E. 503, 503–04 (S.C. 1935) (finding that the question of a
school teacher's reliance on an insurance company's false representations was properly
submitted to the jury because the teacher knew little or nothing of insurance matters and
was potentially mentally incapable of understanding them due to his affliction); Barber,
353 S.E.2d at 883–84 (holding that a wife's reliance on her husband's statement that the
Mexican divorce is invalid did not justify her failure to answer the husband's summons
and petition for annulment).
    At best, Beaumont might allege that an analogy exists to times where courts have
allowed questions of reliance on a misrepresentation to reach a jury if the person who

at 29–30.  The court need not comb through cases to determine whether an exception to

applies because Beaumont has not met the eighth element of a fraud claim: that he had

the right to rely on defendants' misrepresentation.  See Schmauch, 582 S.E.2d at 444–45.

Defendants argue that Beaumont has not presented any facts which plausibly state

that he had a right to rely on defendants' representation—which he did for almost four

years—or that his reliance was reasonable.  ECF Nos. 14-1 at 13; 17 at 12.  "The right to

rely must be determined in light of the representee's duty to use reasonable prudence and

diligence under the circumstances," which is determined "on a case by case basis."

Florentine Corp. v. PEDA I, Inc., 339 S.E.2d 112, 114 (S.C. 1985).  Various

circumstances to consider "include the form and materiality of the representation; the

respective age, experience, intelligence and mental and physical conditions of the parties;

and the relations and respective knowledge and means of knowledge of the parties."  Id.

(citing Parks v. Morris Homes Corp., 141 S.E.2d 129 (S.C. 1965)).  There is no right to

rely where there is no confidential or fiduciary relationship and the transaction at issue is

an arm's length transaction between mature, educated people.  Id.  "This is especially true

in circumstances where one should have utilized precaution and protection to safeguard

his interests."  Id. (citing Thomas v. Am. Workmen, 14 S.E.2d 886 (S.C. 1941)).

Beaumont does not state facts which plausibly show that he had a right to rely on

---

relied on that misrepresentation was somehow prevented from discovering the
misrepresentation, through either the complexity of the material or the person's disability.
Perhaps Beaumont is arguing that despite investing his entire net worth of $250,000, he
was an "unsophisticated investor . . . who was inexperienced in the laboratory space" and
therefore should be excused for his failure to exercise due diligence and confirm that
EKRA applied.  See ECF No. 15 at 29.  However, Beaumont does not himself make this
argument, so it would be difficult for the court to conclude that his footnotes, standing
alone, are sufficient to establish Beaumont's reliance on the misrepresentation should
qualify under an exception and survive a motion to dismiss.

defendants or that his reliance was reasonable. "The failure to prove any element of fraud . . . is fatal to the claim." <u>Schnellmann</u>, 645 S.E.2d at 241. As such, the court grants the motion to dismiss Beaumont's fraud claim.

### 2. SCUTPA

SCUTPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. Code Ann. § 29-5-20(a) (1985). To bring a successful SCUTPA claim, "the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." <u>Wright v. Craft</u>, 640 S.E.2d 486, 498 (S.C. Ct. App. 2006). Beaumont and defendants primarily contest whether Beaumont has stated facts that plausibly meet the second element of a SCUTPA claim—namely, whether the act affected the public interest.

Defendants argue that Beaumont has not stated any facts which plausibly demonstrate that the unlawful trade practice had an adverse impact on the public interest. ECF No. 14-1 at 20. Since the alleged wrongs are entirely private in nature, SCUTPA is inapplicable. <u>Id.</u> In response, Beaumont contends that defendants' actions "of soliciting high-risk investments from an unsophisticated investor and then misrepresenting the investor's interest and ability to receive the agreed-upon payments under laws governing medical laboratories before restructuring to avoid payment altogether are capable of repetition and must be deterred." ECF No. 15 at 32. In reply, defendants reiterate their

argument that Beaumont has merely stated threadbare allegations, supported by conclusory statements, in his assertion of a SCUTPA claim. ECF No. 17 at 15.

Based on the operative complaint, the court finds that Beaumont has not pleaded facts which show that "the unfair or deceptive act affected the public interest." Wright, 640 S.E.2d at 498. Thus, the court grants defendants' motion to dismiss Beaumont's SCUTPA claim. However, in the alternative, Beaumont requests to amend his complaint. ECF No. 15 at 32. Beaumont asks that if the court finds the current allegations insufficient, he requests leave to amend the complaint to add additional allegations regarding at least one additional investor Branch and Harrelson similarly defrauded: Beaumont's former supervisor Shane Powell ("Powell"). Id. Rule 15(a) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a). "[L]eave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." Foster v. Wintergreen Real Est., Co., 363 F. App'x 269, 276 (4th Cir. 2010). Defendants urge the court to deny as futile Beaumont's request to amend the complaint to include allegations from Powell because even assuming that another person was impacted similarly to Beaumont, he has nevertheless "fail[ed] to plausibly show that the public will be adversely impacted by Defendants' alleged misrepresentations." ECF No. 17 at 15–16.

A plaintiff may show that unfair or deceptive acts or practices have an impact upon the public interest by demonstrating a potential for repetition. Haley Nursery Co. v. Forrest, 381 S.E.2d 906, 908 (S.C. 1989); Noack Enters., v. Country Corner Interiors of

Hilton Head Island, Inc., 351 S.E.2d 347, 350–51 (S.C. Ct. App. 1986). The potential for repetition is generally demonstrated in one of two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." Wright, 640 S.E.2d at 502. However, "the plaintiff in a SCUTPA action is required only to allege and prove those facts sufficient to demonstrate potential for repetition; at that point, plaintiff has proven an adverse effect on the public interest sufficient to recover under the SCUTPA." Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc., 176 F. Supp. 2d 510, 516 (D.S.C. 2001). SCUTPA relief is "not available to redress a private wrong where the public interest is unaffected." Columbia E. Assocs. v. Bi-Lo, Inc., 386 S.E.2d 259, 263 (S.C. Ct. App. 1989); see also Noack Enters., 351 S.E.2d at 349–50. Even "a deliberate or intentional breach of a valid contract, without more, does not constitute a violation of [SCUTPA]." Id. "Otherwise every intentional breach of contract within a commercial setting would constitute an unfair trade practice and thereby subject the breaching party to treble damages." Ardis v. Cox, 431 S.E.2d 267, 271 (S.C. Ct. App. 1993).

As such, the court grants leave to amend the complaint. The court finds that despite defendants' arguments to the contrary, the amended complaint would not be futile since additional evidence that defendants previous defrauded other investors would plausibly state facts sufficient to meet the second element. To reiterate, to state a SCUTPA claim, the plaintiff must show (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the

defendant's unfair or deceptive act(s)."  Wright, 640 S.E.2d at 498.  On a motion to dismiss, the court evaluates whether the plaintiff has pleaded facts which plausibly state a claim upon which relief may be granted.  Beaumont has not met his burden for a SCUTPA claim on the operative complaint, but the court grants his request to amend the complaint pursuant to Fed. R. Civ. P. 15(a) because it would cure the clear deficiency on the second element of the SCUTPA claim.  Should defendants disagree, they may file a second motion to dismiss the amended complaint.

### 3.  Member Oppression

"In the corporate setting, a minority shareholder's action for shareholder oppression is one in equity," which likewise applies to a minority LLC member's action for oppression.  Wilson v. Gandis, 844 S.E.2d 631, 635 (S.C. 2020).  "A member or manager may maintain an action against a limited liability company or another member or manager for legal or equitable relief" to enforce his statutory rights under the Uniform Limited Liability Company Act of 1996 (the "LLC Act"), his rights under an operating agreement, and "the rights that otherwise protect the interests of the member."  S.C. Code Ann. § 33-44-410(a).

Defendants claim that Beaumont does not allege that he has ever been a member, or been adjudicated to be a member, of any of the corporate defendants.  ECF No. 14-1 at 18.  Since Beaumont has not stated facts which establish that he was or is a member of MedCoast, Avante, or Vikor, he consequently cannot bring an action for member oppression.  Id.  The applicable law provides such a remedy only to members of limited liability companies.  Id.

In response, Beaumont contends that he has sufficiently alleged his membership in the LLC to support his claims of member oppression and failure to provide access to books and records. ECF No. 15 at 30. Beaumont contends that Branch and Harrelson are the only two recognized members of Vikor, but he should also be considered among them because "he received ownership and profit interests in the laboratory ventures." Id. As such, he should be a member or, at a minimum, a transferee of distributional interests and one of the purposes of this action is to recognize Beaumont as such. Id. at 30–31. Finally, Beaumont contends that defendants cite no authority "for the proposition that an LLC member must participate in management decisions to bring suit seeking recognition of his interests." Id. at 31.

In reply, defendants emphasize that Beaumont has acknowledged that he has not been recognized or adjudicated as a member or manager of any of the corporate defendants. ECF No. 17 at 12–13. Thus, Beaumont has failed to state a plausible claim that he is entitled to relief under the LLC Act and the legal remedies under South Carolina Code section 33-44-410(a) are inapplicable to him. Id. Stated succinctly, defendants urge the court to conclude that "[t]he claim for member oppression by a non-member with no involvement in the business enterprise is implausible and should be dismissed." Id. at 14. Finally, defendants emphasize that to the extent Beaumont is using these causes of action to declare himself a member of the corporate defendants, he has not filed a declaratory action seeking a declaratory judgment—rather, he has asserted the claims as a member seeking relief. Id. at 14–15.

The court find that defendants are correct: a member oppression claim is statutorily limited to those persons who are members of the limited liability corporation.

43

See S.C. Code. Ann. § 33-44-410.  Beaumont contends he has sufficiently stated facts

which indicate that he is a member of one, if not all, of the corporate defendants, and

that this case seeks to obtain a recognized membership interest in the LLC.  ECF No. 15

at 31.  In support of his assertion, Beaumont cites a case from the Western District of

Louisiana to explain that he may use the member oppression claim to obtain a

recognized membership interest in the LLC.  Id. at 31 n.157 (citing Pitts v. United Built

Homes, 2022 WL 19333369, at *2 (W.D. La. Oct. 19, 2022)).  Yet such a conclusion

seems premature because the parties disagree over whether Beaumont's investments

were for debt or equity.  If the investments were for debt, he cannot bring a member

oppression suit; but if they were for equity, he might.  It is telling that Beaumont cites to

Louisiana law to reach his conclusion that a member oppression claim may allow a

plaintiff to obtain a recognized membership interest in the LLC—he cites to no South

Carolina case which supports this proposition, and the court has likewise been unable to

find one.  See ECF No. 15 at 31 n.157.  The court declines to create a novel

interpretation of South Carolina law, especially where a declaratory judgment action

exists to furnish that exact relief.  Should he wish to be declared a member of the LLCs,

Beaumont may amend his complaint to include a declaratory judgment claim within this

lawsuit.  Consequently, the court dismisses this claim without prejudice for failure to

state a claim.

### 4.  Failure to Provide Access to Books and Records

Defendants argue that Beaumont's failure to provide access to books and records

claims is implausible on its face.  ECF No. 14-1 at 17.  This is because under South

Carolina law the right to demand access to records and information from a limited

44

liability company is available only to members and former members and their authorized representatives for records pertaining to the period during which they were members. Id. (citing S.C. Code Ann. § 33-44-408(a)). Thus, since Beaumont does not allege, and cannot allege, he was a member or former member of Vikor, he cannot bring this cause of action. Id. at 18.

For the same reasons provided under the member oppression analysis, the court dismisses this claim without prejudice because Beaumont has not been adjudged a member of any of the corporate defendants. As such, he lacks standing to bring a failure to provide access to books and records claim under section 33-44-408(a) because that right is reserved to "members and their agents and attorneys." See S.C. Code Ann. § 33-44-408(a).

### 5. Successor Liability

Ordinarily, in the absence of a statute, a successor or purchasing corporation is not liable for the debts of a predecessor or seller unless: (1) there was an agreement to assume such debts; (2) the circumstances surrounding the transaction amount to a consolidation or merger of the two corporations; (3) the successor company was a mere continuation of the predecessor; or (4) the transaction was entered into fraudulently for the purpose of wrongfully defeating creditors' claims. Nationwide Mut. Ins. Co. v. Eagle Window & Door, Inc., 818 S.E.2d 447, 451 (S.C. 2018 (citing Brown v. Am. Ry. Express Co., 123 S.E. 97 (S.C. 1924)).

Defendants argue that Beaumont fails to state a plausible claim for successor liability because Beaumont received full repayment for his $250,000 prior to Avante being administratively dissolved in June 2020. ECF No. 14-1 at 21–22. Additionally, the

45

complaint purportedly lacks sufficient factual allegations "to state a claim that Vikor is a successor company to Avante for any purpose, much less for the purpose of a claim for 'perpetual payments.'" Id. at 22.  Moreover, Beaumont has not alleged there was a de facto merger or mere continuation from Avante to Vikor.  Id. at 23.  Thus, defendants urge the court to find that Beaumont has failed to plausibly state a claim for successor liability.  Id.

In response, Beaumont argues that the complaint supports multiple theories of successor liability.  ECF No. 15 at 32–34.  Initially, Beaumont reiterates that he invested in Branch and Harrelson's laboratory ventures for equity, not for debt.  Id. at 33. Moreover, the allegations and reasonable inferences from his complaint "plausibly show that Vikor received assets from Medcoast and/or Avante."  Id.  Beaumont asks the court to infer that MedCoast and Avante's assets became tied up in Vikor from the six-month payment pause, from the cease-payment notice which recognized that Beaumont's investments were used to build Vikor, and from the fact that Vikor's time of founding aligns with the period where Beaumont's payments were at their highest.  Id. Additionally, Beaumont avers that all four exceptions to the general rule of successor non-liability apply here.  Id. at 33–34.  Namely, there was an agreement to assume the payments to Beaumont that were formalized with Avante and MedCoast, the circumstances surrounding the transaction warrant a finding of consolidation or merger of the two corporations, Vikor merely continued MedCoast and Avante, and the transaction to restructure Vikor was entered into fraudulently to deprive Beaumont of his payments. Id.  Consequently, Beaumont urges the court to deny the motion to dismiss his claim of successor liability.  Id.

In reply, defendants argue that Beaumont has "alleged no facts supporting any of the limited, well-settled exceptions to the general rule against successor liability."  ECF No. 17 at 16.  Beaumont has not alleged a sale of business assets between any of the defendants.  Id. at 17.  There are no allegations that Beaumont ever received payment from Avante since all the repayments came from Harrelson and Branch.  Id.  Moreover, there are no allegations that Vikor was created for the fraudulent purpose of defrauding Avante's creditors.  Id.  Finally, Beaumont fails to allege that he is a creditor of Avante or that a debt is owed since he received full repayment for his $250,000 advance.  Id.  Thus, defendants urge the court to find that the allegations in the complaint fail to allege a transaction that would give rise to successor liability under one of the four exceptions. Id.

The court need not analyze all four exceptions to the general rule against successor liability, because Beaumont has pleaded facts which plausibly state that the mere continuation exception applies.  See ECF No. 15 at 33–34.  There are three LLCs named as defendants to this action: MedCoast, Avante, and Vikor.[10]  Compl. ¶¶ 1, 7–9. All three operate as laboratory diagnostics companies formed by Branch and Harrelson, with Vikor being "the culmination of [] Branch[] and [] Harrelson's laboratory ventures." Id.  Under his successor liability claim, Beaumont contends that Branch, Harrelson, and Vikor agreed to assume the obligations of MedCoast and Avante—specifically, payments

---

[10] The court notes that upon an initial Google search it also found a fourth company co-founded by Branch and Harrelson: Kor Cannabis.  See Who We Are, Kor Cannabis, https://perma.cc/M37P-YM7B (last visited October 17, 2023).  However, given that the parties omit Kor Cannabis from the complaint and briefs, the court assumes it is not at issue, particularly where its business is factually distinct from that of MedCoast, Avante, or Vikor.

pursuant to the August 2017 Agreement and the September 2017 Agreement.  Id. ¶¶ 141–145.  Thus, "the transition to Vikor has been under circumstances that amount to a consolidation of the businesses or demonstrate a de facto merger into Vikor."  Id. ¶ 147.  Additionally, Beaumont contends that despite the dissolution of Avante and limited role that MedCoast now plays in Branch and Harrelson's laboratory ventures, "the core players and members of the LLCs have remained the same: Mr. Branch and Ms. Harrelson" who were and continue to be the joint owners and controlling members of the laboratory ventures.  Id. ¶ 146.

The mere continuation exception "require[s] commonality between officers, directors, and shareholders."  Eagle Window & Door, Inc., 818 S.E.2d at 453.  While that commonality is "almost always sufficient to establish mere continuation" for that exception, "control is an essential consideration as well."  Id. at 454.  As such, "there may be instances where directors or officers—lacking ownership—exert such control and influence over a corporation that their continued presence after a corporate acquisition is sufficient to establish successor liability."  Id.  As such, the "successor liability doctrine affords protection for plaintiffs in those cases where a corporate sale is driven by a desire to escape the predecessor's liabilities and obligations."  Id.  Given that all three corporate defendants operate in the same laboratory diagnostics space, Vikor took up the payments to Beaumont after restructuring, and that Beaumont has pleaded facts which show that there is commonality between officers, directors, and shareholders, the court denies the motion to dismiss the successor liability claim.

In sum, the court grants the motion to dismiss and dismisses without prejudice Beaumont's breach of the implied covenant claim for both the August 2017 Agreement

and the September 2017 Agreement, his fraud claim, his SCUTPA claim, his member oppression claim, and his failure to produce books and records claim. But the court denies the motion to dismiss Beaumont's claims of breach of contract and breach of contract accompanied by fraudulent act for both the August 2017 and the September 2017 Agreements and denies the motion as to his successor liability claim. Dismissal of the claims is without prejudice, and the court gives Beaumont leave to amend his complaint.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss. Leave to amend the complaint is **GRANTED** and Beaumont shall have fifteen (15) days to file an amended complaint.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 26, 2023**
**Charleston, South Carolina**

49